IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 13, 2024

## STATE OF TENNESSEE v. JONATHAN KEITH HUGHES, JR.

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2016-CR-174    Larry J. Wallace, Judge**

_____

### No. M2023-00732-CCA-R3-CD

_____

The defendant, Jonathan Keith Hughes, Jr., was convicted by a Dickson County Circuit Court jury of one count of first degree murder, one count of criminally negligent homicide, and three counts of conspiracy to commit murder. On appeal, the defendant challenges the trial court's admission of evidence of his gang affiliation, the trial court's failure to provide an accomplice instruction to the jury, and the sufficiency of the convicting evidence. Upon review of the record, we remand the case to the trial court for entry of corrected judgments reflecting the defendant's convictions for conspiracy to commit first degree murder under the proper statute. We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TIMOTHY L. EASTER, J., joined.

Gordon W. Rahn (on appeal); and Christopher Clark (at trial), Clarksville, Tennessee, for the appellant, Jonathan Keith Hughes, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; W. Ray Crouch, District Attorney General; and Carey Thompson and Jennifer Stribling, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

Following the April 12, 2016 murders of the victims, Quintin Tidwell, Sr., and Marcedez Teroy Bell, as well as the attempted murder of Montae Springer, the defendant was charged with two counts of first degree murder, one count of attempted first degree murder, and three counts of conspiracy to commit murder. The Dickson County

Grand Jury also indicted Isiah Primm[1] and Kurtis Primm as codefendants, who were tried separately.[2]

The defendant was tried over several days in November of 2019. Jeff Bledsoe, the Dickson County Sheriff, testified that during the late morning of April 12, 2016, he responded to a call that a shooting had occurred at the public picnic grounds located in Charlotte, Tennessee ("the picnic grounds"). Sheriff Bledsoe drove to the picnic grounds along with Chief Deputy Jerone Holt and Captain Steve Gray. As they approached the picnic grounds, the officers encountered two men, whom he was unable to identify. These two individuals directed the officers to drive towards the intersection of Picnic Drive and Dotson Street, where a gray Dodge Charger had crashed into a tree and blocked the roadway.

Upon arriving at the picnic grounds, Sheriff Bledsoe exited his vehicle, approached the Dodge Charger, and opened its rear passenger door. Sheriff Bledsoe saw smoke in the vehicle's cabin, which he believed to have been caused by the deployment of the vehicle's airbags. Sheriff Bledsoe then discovered Mr. Bell, who appeared to have been shot in the head, lying "across the console with his upper body and head at the passenger door." After an inspection of Mr. Bell's body, Sheriff Bledsoe felt Mr. Bell "exhaust air." Sheriff Bledsoe, with the assistance of Detective Russell Morgan and Deputy Clint Hopper, removed Mr. Bell from the vehicle and began attempting to revive him while they awaited the arrival of Emergency Medical Services ("EMS") units. During his attempts to revive Mr. Bell, Sheriff Bledsoe was notified that there were two additional victims in the area.

After the victims were removed from the picnic grounds, Sheriff Bledsoe traced the Dodge Charger's path from Lincoln Street, which was adjacent to the picnic grounds. He concluded that the vehicle had been driven through the yards of several nearby mobile home residences, noting that it had collided with a portion of one residence and a utility pole before crashing at the base of a tree. He also noted that the vehicle appeared to have been shot at several times near the driver's side window.

On cross-examination, Sheriff Bledsoe estimated that it took between 30 and 45 minutes for EMS units to arrive to attend to the victims. After their arrival, Sheriff Bledsoe left to investigate the status of another victim, whom he later identified as Mr. Tidwell. He recalled that he instructed officers to cordon off the perimeter of the picnic

---

[1]     We note that Isiah Primm is referred to as "Isiah" in the transcripts of this case as well as by the State and the defendant in their briefs. However, the indictments and several filings from the trial court spell his first name as "Isaiah." For the sake of consistency with the trial court, we will refer to this codefendant as the trial court did and use the spelling "Isiah."
[2]     Because the two codefendants in this case share the same last name, we will refer to them by their first names. No disrespect is intended.

grounds but was uncertain of whether the perimeter initially included nearby Picnic Drive. Nevertheless, the perimeter was later extended after the discovery of the third victim, Mr. Springer, on Picnic Drive. Sheriff Bledsoe testified that he was unsure of how many people could have entered or exited the picnic grounds before it was completely cordoned off. He recalled that there was a breach of the perimeter when Mr. Tidwell's brother, Anthony Thompson, entered from the eastern side of the picnic grounds. Sheriff Bledsoe described Mr. Thompson as distraught and upset over his brother's injuries and that his apparent intentions were to "get to his brother and check on him." Sheriff Bledsoe informed Mr. Thompson of the need to secure the perimeter around the picnic grounds and escorted him out. He testified that Mr. Thompson did not enter the portion of the crime scene where the victim was located and did not disturb any evidence.

Chief Deputy Jerone Holt of the Dickson County Sheriff's Office testified regarding his response to the April 12, 2016 shooting. He recalled that two unidentified men pointed him toward the crime scene, where he, along with Sheriff Bledsoe and Captain Gray, first saw the crashed gray Dodge Charger at the intersection of Picnic Drive and Dotson Street. He noted that there was "a lot of smoke from the crash" emitting from the vehicle's engine and that he saw Mr. Bell lying "across the console towards the passenger's seat."

After he learned that there were two additional victims at the picnic grounds, Chief Deputy Holt returned to his vehicle and drove to the east side of the picnic grounds, where he found Mr. Tidwell. Chief Deputy Holt noted that Mr. Tidwell appeared to be deceased. He then drove to the west side of the picnic grounds, where he found the third victim, Mr. Springer. Mr. Springer told Chief Deputy Holt that he had been shot and "was hurting in his groin area." Mr. Springer said that he had been running from his assailant and was unsure of who had shot him. Chief Deputy Holt waited with Mr. Springer until an EMS unit arrived to take him to the hospital. He was unsure of how many times Mr. Springer had been shot.

On cross-examination, Chief Deputy Holt stated that he would have driven past Mr. Tidwell and Mr. Springer when he first arrived at the picnic grounds. He estimated that he spent between two and four minutes at Mr. Bell's crashed vehicle before he drove to investigate the other two victims. He also recalled that several people were present at the picnic grounds near the victims when he arrived, including several people near Mr. Tidwell and two women "praying over" Mr. Springer.

Captain Steven Wallace, a Dickson County EMS supervisor, testified that he, along with three other EMS units, responded to the April 12, 2016 shooting. He recalled that two EMS units were already present at the picnic grounds when he arrived. One paramedic attempted to revive Mr. Tidwell and another prepared Mr. Springer for transportation to the hospital. After he determined that Mr. Tidwell had no pulse, he went to assist with Mr. Springer, whom he described as having been shot multiple times, with

injuries to his face, left shoulder, abdomen, left upper thigh, and potentially to his back. Captain Wallace recalled that Mr. Springer was awake throughout his encounter with him and that he spoke coherently but was in great pain and distress.

Robert Corlew testified that he lived in a mobile home residence near the picnic grounds. On the morning of April 12, 2016, he stood near a barbecue pit at the picnic grounds and spoke with William Gilbert regarding Mr. Gilbert's recent purchase of a vehicle. During their conversation, Mr. Corlew saw three men walking "around the edge" of a nearby garden towards the picnic grounds. Shortly afterwards, Mr. Corlew heard several gunshots, and he and Mr. Gilbert took shelter behind Mr. Gilbert's vehicle. He later saw the three men run away from the picnic grounds.

Agent Shawn Atkins of the Tennessee Bureau of Investigation ("TBI") testified that he assisted the Dickson County Sheriff's Office with their investigation into the April 12, 2016 shooting. As part of this investigation, Agent Atkins and Detective Chad Bausell of the Dickson County Sheriff's Office interviewed the defendant.

A recording of the defendant's April 16, 2016 interview with Agent Atkins and Detective Bausell was played for the jury. During the interview, Detective Bausell told the defendant that he had recently interviewed Mr. Springer, who had informed him that the defendant was among the shooters at the picnic grounds. The defendant denied any involvement with the shooting and stated that he had no reason to harm Mr. Springer, noting that Mr. Springer was his cousin. The defendant said that he had worked from 11:00 p.m. on April 11 until 7:00 a.m. on April 12, which Agent Atkins later confirmed after retrieving the defendant's work timesheets. The defendant stated that after he left work on the morning of April 12, he drove to Nashville for a gang meeting, so he could not have been present at the picnic grounds at the time of the shooting. The defendant provided the names of several individuals who he claimed could attest to his presence in Nashville at the time of the shooting, including Mr. Thompson and Kurtis. The defendant was released by the officers after this interview. Agent Atkins testified that he interviewed the defendant a second time, but this second interview was not included in the record or played for the jury.

On cross-examination, Agent Atkins recalled that a loaded Kel-Tec pistol was recovered from the picnic grounds, along with a number of Winchester and Perfecta brand nine-millimeter bullet casings. He also stated that he assisted the Dickson Police Department with the preparation of a search warrant for Kurtis' apartment.

Lieutenant Jimmy Mann of the Dickson Police Department testified that he executed a search warrant for Kurtis' apartment on the evening of April 12, 2016, on the suspicion that cocaine would be located therein. He stated that this search was unrelated to the April 12, 2016 shooting. The search recovered, among other things, a variety of drug paraphernalia, a single nine-millimeter bullet discarded by the kitchen stove, a box of nine-

millimeter bullets in the spare bedroom closet, three nine-millimeter bullets on the headboard of the bed in the master bedroom, a plastic bag with several nine-millimeter bullets stored in the headboard's center drawer, and a .32 millimeter Smith & Wesson revolver.

Addison Wilson testified that he and Kurtis had previously been "business partners" in "the car selling business." On the morning of April 12, 2016, Mr. Wilson drove to Kurtis' apartment in Dickson to discuss the upcoming sale of a "blue or purple" Chevrolet Impala. Already present at Kurtis' apartment were Isiah, Kurtis, Kenneth "Kenny" Flanagan, and the defendant. Mr. Wilson testified that these men were engaged in a conversation regarding Isiah's intentions to fight Mr. Tidwell. Mr. Wilson noted that the defendant "didn't really say much at all" and "just laughed" at points during the conversation. He did not recall seeing any firearms and testified that he did not know either Kurtis or Isiah to customarily carry a firearm. He described the defendant's involvement in the conversation as distant and noted that the defendant occasionally left the conversation to speak on his cell phone.

On cross-examination, Mr. Wilson stated that he did not believe the defendant took the discussion of Isiah and Mr. Tidwell's dispute seriously. He also testified that there was no discussion of escalating Isiah and Mr. Tidwell's dispute beyond a fistfight.

William Gilbert testified that on the morning of April 12, 2016, he drove a truck he had recently purchased for his daughter to visit Mr. Corlew at his home near the picnic grounds. Shortly after his arrival and during his discussion with Mr. Corlew, three men crossed Mr. Corlew's property and walked towards Mr. Gilbert and Mr. Corlew. Mr. Gilbert and Mr. Corlew greeted the three men as they walked past them towards the picnic grounds. Mr. Gilbert testified that he recognized Isiah among them. Shortly afterwards, Mr. Gilbert heard "more than a dozen" gunshots, and he and Mr. Corlew took shelter behind his truck. Mr. Gilbert testified that though he did not see the shooting directly, he saw Isiah and the other two men running away from the picnic grounds shortly after he heard the gunshots.

On cross-examination, Mr. Gilbert stated that the two men whom he did not recognize ran away from the picnic grounds first and that Isiah followed them shortly thereafter. He could not say whether the defendant was among the men he saw.

Kenneth "Kenny" Flanagan testified that he sold cars with Kurtis and Mr. Wilson. During the early morning of April 12, 2016, Mr. Flanagan met with Isiah, and the two men "just rode around" in Isiah's vehicle for several hours. Around 8:00 a.m., Isiah received a phone call from someone Mr. Flanagan could not identify in which he discussed his dispute with Mr. Tidwell. During this call, the caller informed Isiah that Mr. Tidwell, Mr. Springer, and Mr. Bell were at the picnic grounds.

Afterwards, Isiah and Mr. Flanagan went to Kurtis' apartment, where he met the defendant for the first time. Mr. Flanagan smoked a cigarette while Isiah briefly entered the apartment before joining him outside, accompanied by Kurtis and the defendant. The conversation soon turned to Isiah's dispute with Mr. Tidwell, and Mr. Flanagan described Isiah's demeanor as "pretty agitated." He stated that the defendant remained "pretty silent" throughout the conversation.

The four men then drove to the picnic grounds. Mr. Flanagan recalled that Isiah drove himself and the defendant in a blue Chevrolet Impala and that Kurtis followed behind them, driving a motorcycle. Mr. Flanagan testified that both Isiah and the defendant took firearms with them to the picnic grounds, noting that the defendant carried a "semiautomatic pistol" in the waistband of his pants. During their drive to the picnic grounds, Kurtis crashed his motorcycle and fell from it, sustaining minor injuries. Kurtis abandoned his crashed motorcycle and entered the Chevrolet Impala, and Mr. Flanagan drove the remainder of the way to the picnic grounds.

Mr. Flanagan recalled that Isiah said during the drive that he intended to "catch a body," which Mr. Flanagan interpreted as boasting and "talking a big game" rather than an expression of an intent to kill Mr. Tidwell. When the group arrived at the picnic grounds, Kurtis instructed Mr. Flanagan to stop the vehicle at "Duke's Market," which Mr. Flanagan described as being between one-half and three-quarters of a mile away from the picnic grounds. Mr. Flanagan did so, and Kurtis, Isiah, and the defendant exited the vehicle. Mr. Flanagan testified that though he could not see the picnic grounds from where he parked the vehicle, he eventually heard "15 to 20 or more" gunshots. He further testified that Kurtis, Isiah, and the defendant were all armed when they exited the vehicle.

Mr. Flanagan testified that he remained in the vehicle until Kurtis, Isiah, and the defendant returned, noting that Isiah was the last among the three to arrive. He described the defendant as "completely out of breath" when he returned to the vehicle. He also noted that Isiah appeared to have been in a fight and was missing a shoe and a jacket he had previously been wearing. Once the three men had returned to the vehicle, Kurtis instructed Mr. Flanagan to "f-ing drive." Mr. Flanagan did so, driving from the picnic grounds to White Bluff, Tennessee. He recalled that the three men were "surprisingly quiet" during the drive, and when he inquired as to what had happened, he was told not to worry about it. Mr. Flanagan testified that the three men discussed what to do next and arranged for people to pick them up once they arrived in White Bluff. He testified that during this discussion, he overheard the defendant suggest to Kurtis and Isiah that they should "trim[] the fat," which Mr. Flanagan interpreted as a threat "to kill me" in order to eliminate him as a witness.

Mr. Flanagan drove Kurtis, Isiah, and the defendant to "an abandoned looking trashy house in White Bluff." Shortly thereafter, Paige Worley arrived, and the

four men abandoned the Chevrolet Impala. Ms. Worley then drove Kurtis, Isiah, and the defendant "somewhere on the east side of Nashville" before driving Mr. Flanagan back to Dickson." Mr. Flanagan testified that this was the last time he saw the defendant.

Mr. Flanagan also testified that he was an unindicted co-conspirator in this case. He disclosed that he had accepted an immunity deal from the State to testify against the defendant to avoid prosecution for his own involvement in the April 12, 2016 shooting.

On cross-examination, Mr. Flanagan testified that he had smoked "quite a bit" of marijuana in the early morning of April 12, 2016, both prior to and after his meeting with Isiah. He stated that he never heard discussion of a plan to kill any of the victims during the drive to the picnic grounds. He stated that Isiah was the only individual who intended to fight at the picnic grounds and described Mr. Springer and Mr. Bell as "innocent bystanders." Mr. Flanagan testified that after Kurtis joined himself, Isiah, and the defendant in the Chevrolet Impala, Mr. Flanagan "was told" to drive them the rest of the way to the picnic grounds. Mr. Flanagan stated that he felt pressured to do so because he knew Kurtis was armed.

Montae Springer testified that the defendant and Mr. Bell were his younger cousins, that Mr. Tidwell was his older brother, and that he, Kurtis, and Isiah were also related. Mr. Springer recalled that he went to the picnic grounds on the morning of April 12, 2016 to meet Mr. Tidwell. Shortly after Mr. Tidwell arrived, Mr. Bell pulled his vehicle over and parked it off of Picnic Drive, adjacent to the picnic grounds, and walked over to talk with Mr. Springer and Mr. Tidwell.

Mr. Springer testified that Mr. Tidwell told him and Mr. Bell about his dispute with Isiah and showed them a text message in which Isiah had threatened to fight Mr. Tidwell. Mr. Springer believed that Mr. Tidwell "overlooked" the disagreement.

Mr. Springer testified that he was sitting at a picnic table when Isiah, Kurtis, and the defendant arrived. Mr. Springer recalled that Kurtis moved to stand behind him, while Isiah remained at the top of a nearby hill and the defendant stood in the street adjacent to the picnic grounds, near the intersection of Picnic Drive and Lincoln Street. Upon his arrival at the picnic grounds, Isiah pointed a firearm at Mr. Springer and stated, "N****[,] you want to die[?]" Mr. Springer did not respond to Isiah's statement, which prompted Isiah to fire his firearm into the air. Mr. Springer testified that Kurtis then began shooting at a nearby vehicle and encouraged Isiah to "burn him."

Mr. Springer stated that Mr. Tidwell moved to stand in front of him after Isiah again pointed his firearm at Mr. Springer. He recalled that Mr. Tidwell then "hit [Isiah] so he wouldn't shoot me in the face." Isiah then shot Mr. Tidwell in the face, and both men fell to the ground in a "scuffle." Mr. Springer testified that he then attempted to reach Mr. Tidwell to help him, but before he could do so, he was shot several times. He

identified Kurtis as his assailant and testified that after being shot, he chased Kurtis down the hill in an attempt to take his firearm away from him. He recalled passing the defendant during his pursuit, but could not recall whether the defendant was armed "because I didn't look that far." He also testified that he did not see the defendant shoot anyone. Mr. Springer stated that Kurtis continued to shoot at him while they ran, but that he ultimately fell to the ground after attempting to leap over a park bench, whereupon Kurtis shot him again. Mr. Springer testified that he had been shot nine times, sustaining injuries in "[m]y stomach, my rectum, my right buttocks, my face, my right shoulder and left shoulder, three inches from my spine, and my left side, my leg."

Mr. Springer recalled that after Kurtis shot him the final time, Kurtis ran past him towards Mr. Bell's vehicle and fired a single shot through the driver's side window. Kurtis then ran back past Mr. Springer towards Isiah and Mr. Tidwell, and Mr. Springer stated that he heard "like two" more gunshots afterwards.

On cross-examination, Mr. Springer reiterated that the dispute at the center of the April 12 shooting had been solely between Mr. Tidwell and Isiah. He recalled having no issues with the defendant. He testified that though he knew Isiah to "play[] tough" and "talk a big game," Mr. Tidwell never engaged with his threats. Mr. Springer was unaware of any dispute between the defendant and Mr. Tidwell.

Agent Laura Hodge of the TBI's Violent Crimes Response Unit testified that she, along with other members of her team, collected evidence from the picnic grounds. She recalled that she later examined 48 different pieces of evidence from the picnic grounds, including 13 Winchester brand nine-millimeter cartridge casings, eight Perfecta brand nine-millimeter cartridge casings, a lead fragment, a Kel-Tec brand pistol bearing a magazine loaded with five Winchester brand nine-millimeter bullets and a single Winchester brand nine-millimeter cartridge casing which had failed to eject from the firearm's chamber after being fired, and a single unidentified bullet.

Agent Hodge examined the Kel-Tec pistol and concluded that it had been used to fire two of the Winchester brand nine-millimeter casings recovered from the picnic grounds. She testified that the casing which had failed to eject from the Kel-Tec pistol's chamber could have been due to the shooter's improper holding of the firearm.

Agent Hodge also examined the cartridge casings and bullets recovered from the picnic grounds. She matched 12 of the Winchester brand cartridge casings to an unknown nine-millimeter pistol, which she testified bore characteristics consistent with those fired from a Smith & Wesson firearm. She also matched the eight Perfecta brand cartridge casings to a different unknown nine-millimeter pistol. She further concluded that six Perfecta bullets recovered from the picnic grounds and from Mr. Bell's body following his autopsy had been fired from the same firearm, which bore characteristics common to SCCY brand firearms.

- 8 -

Agent Hodge concluded that though only a single firearm was recovered from the picnic grounds, two additional firearms had been used in the April 12, 2016 shooting. She testified that, to her knowledge, those firearms had not been recovered. On cross-examination, she noted that both the firearms and the bullets used were fairly inexpensive.

Doctor Emily Dennison of the Davidson County Medical Examiner's Office testified as an expert in forensic pathology regarding the autopsies she performed on Mr. Tidwell and Mr. Bell. She concluded that Mr. Tidwell sustained four perforating gunshot wounds, while Mr. Bell sustained two perforating gunshot wounds and four penetrating gunshot wounds. Doctor Dennison recovered four "projectiles" from Mr. Bell's penetrating wounds and submitted them to the TBI for examination. She determined that both Mr. Bell and Mr. Tidwell's deaths were homicides caused by their multiple gunshot wounds.

The State rested. Following a *Momon* colloquy, the defendant elected to testify.

The defendant testified that he worked an overnight shift on April 11, 2016, which began at 11:00 p.m. and concluded at 7:00 a.m. on April 12, 2016. He recalled that he left his workplace around 7:15 a.m. and drove to his home in Lyles, Tennessee, a commute which he estimated took between 20 and 30 minutes. The defendant remained at his home for approximately one hour before he received a text message and phone call from Kurtis, who "said he had some cars for me to come and look at." The defendant stated that he and Kurtis had previously discussed the defendant's desire to purchase a vehicle for his mother. Accordingly, the defendant left his home in Lyles and drove to Kurtis' apartment in Dickson.

The defendant recalled that Kurtis, Isiah, and Mr. Flanagan were briefly present at Kurtis' home when he arrived but that they left shortly afterwards. He described Isiah's mood as generally positive before he left, but when he returned, he was "mad, upset, hurt," and "he told Kurtis that [Mr. Tidwell] was down at his mama's house." The defendant stated that the dispute between Isiah and Mr. Tidwell was "about some money that supposedly came up missing" and noted that Isiah intended to "beat [Mr. Tidwell] up" over it. The defendant testified that he did not offer any suggestions as to how to deal with the dispute because it "had nothing to do with me" and that he only accompanied Isiah, Kurtis, and Mr. Flanagan to the picnic grounds because Mr. Tidwell was his cousin and he "wanted to go see the fight."

The defendant denied that he went to the picnic grounds armed. He recalled that while the group was traveling to the picnic grounds, Kurtis wrecked his motorcycle and sustained injuries which caused him to walk with a limp. He noted that Isiah drove the

vehicle at first, but that Mr. Flanagan drove the remainder of the way after Kurtis wrecked his motorcycle. The defendant denied that Mr. Flanagan was forced to drive.

Mr. Flanagan dropped the defendant, Isiah, and Kurtis off near the home of one of the Primm brothers' cousins. While the three men walked to the picnic grounds, Isiah discussed his plan to fight Mr. Tidwell, and the defendant testified that Isiah never threatened to escalate the conflict beyond a fistfight. He also recalled speaking briefly to Mr. Gilbert and Mr. Corlew while walking to the picnic grounds.

The defendant testified that he, Isiah, and Kurtis took a path he described as "a short cut" to the picnic grounds which took them through the nearby woods. Upon exiting the woods, the defendant saw Mr. Tidwell, Mr. Springer, and Mr. Bell standing together. The defendant stated that though Kurtis and Isiah approached the three victims, he remained behind because "this [was] not my fight." Isiah withdrew a firearm, fired it into the air, and asked Mr. Springer, "[D]o you think I'm playing, do y'all want to die?" Mr. Tidwell then approached Isiah and hit him, causing Isiah to drop his firearm, and the two men "roll[ed] around on the ground fighting over the gun."

The defendant stated that he was unaware that Isiah was armed until he withdrew his pistol. He testified that while Isiah fought Mr. Tidwell and Kurtis pursued Mr. Springer, he remained still, "dropped my head," and cried. The defendant further noted that at some point during Mr. Springer and Kurtis' fight, Kurtis ran out of ammunition and switched to a different firearm, which he then used to shoot into Mr. Bell's vehicle. Afterwards, Kurtis walked over to the defendant and told him to accompany him away from the picnic grounds.

The defendant averred that though he was "devastated" after witnessing two of his cousins "get gunned down," he left the picnic grounds with Isiah and Kurtis because they were "my only transportation to get away from that scene." He denied that he shot anyone while at the Charlotte picnic grounds. He stated that he had never seen Kurtis or Isiah act so violently and had no idea that they intended to shoot the victims until they had already done so. Mr. Flanagan drove the defendant, Isiah, and Kurtis from the picnic grounds to an abandoned home in White Bluff, where they left their vehicle and were driven to Nashville by Ms. Worley. The defendant denied that he threatened Mr. Flanagan by suggesting that they "trim[] the fat." After a brief stop in Nashville, Ms. Worley drove the defendant to the McDonald's where his mother worked "on Murfreesboro Road."

The defendant recalled that during his interview with Agent Atkins, he lied regarding his involvement in the April 12 shooting. He stated that he did so because he was frightened of "something happening to me or my family," as he had been threatened by "Kurtis'[] people" prior to his interview. He noted that shortly after the April 12 shooting, several armed individuals, whom he identified as "Kurtis'[] people," visited the

- 10 -

defendant at his mother's home in Nashville and told the defendant "[i]f I don't keep my mouth shut, something is going to happen to me, my mama, or my little brother."

On cross-examination, the defendant again testified that he was unarmed when he went to the picnic grounds. He denied that he shot anyone and disagreed with Mr. Flanagan and Mr. Springer's testimony to the contrary. He stated that he did not call the police after witnessing the shooting because he did not bring his cell phone with him to the picnic grounds. He denied that he, Isiah, and Kurtis took the "short cut" through the woods to the picnic grounds in order to sneak up on the victims, averring that he simply followed Isiah and Kurtis because they knew the area better than he.

The defendant rested. Upon this evidence, the jury dismissed the charge of attempted first degree murder and convicted the defendant of one count of first degree murder, one count of criminally negligent homicide, and three counts of conspiracy to commit first degree murder. Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment plus 62 years, to be served consecutively. The defendant filed a timely but unsuccessful motion for new trial. This timely appeal followed.

On appeal, the defendant challenges the trial court's admission of evidence of his gang affiliation, the trial court's failure to provide an accomplice instruction to the jury, and the sufficiency of the convicting evidence.

*I. Rule 404(b)*

First, the defendant challenges the trial court's admission of evidence of his gang affiliation. At the conclusion of the first day of the defendant's November 2019 trial, the defendant requested a hearing pursuant to Tennessee Rule of Evidence 404(b) to exclude portions of his April 16, 2016 video recorded custodial interrogation.

During the Rule 404(b) hearing, Agent Atkins testified that he initially considered the defendant a suspect in the April 12, 2016 shooting after he interviewed Mr. Springer. Accordingly, Agent Atkins arranged to interview the defendant on April 16, 2016, at the Dickson County Sheriff's Office, where the defendant was already present due to his arrest on an unrelated theft charge.

During the defendant's interview, the defendant stated that Mr. Springer was his cousin and stated he would have had no reason to harm him. After learning that Mr. Springer had implicated him in the April 12, 2016 shooting, the defendant recalled that he had worked the overnight shift from 11:00 p.m. on April 11 to 7:00 a.m. on April 12. After he left work, the defendant drove to Hickman, Tennessee, and then to Nashville. The defendant stated first that he traveled to Nashville to visit his mother, family, and the mother of his child, and later stated that he traveled to Nashville in order to be present at a

gang meeting. Nevertheless, he stated that he was unsure why Mr. Springer would have implicated him. He mentioned that he was at a gang meeting at least three times during his interview and provided a list of the names and phone numbers of individuals, including Mr. Thompson and Kurtis, who he claimed could attest to his presence in Nashville rather than the picnic grounds at the time of the April 12 shooting.

The court reviewed the recording of this interview and then heard arguments. The defendant argued that his mention of his gang affiliation and mention of his unrelated theft charge were unnecessarily prejudicial. The defendant further contended that his gang affiliation presented no relevant material issue to the present case and that none of Rule 404(b)'s exceptions applied, noting that he did not intend to present an alibi defense. The defendant requested that the video recording be excluded completely, but in the alternative, that the trial court redact it and only allow the jury to listen to the audio so as to avoid them seeing the defendant in handcuffs.

The State conceded that the evidence of the defendant's unrelated theft charge should be excluded as irrelevant. Otherwise, the State argued that the full video recording should be presented to the jury because the defendant voluntarily mentioned his gang affiliation by presenting it as an alibi. The State also argued that the defendant's participation in a gang was relevant to the case because Kurtis, whom the defendant mentioned as able to verify his presence in Nashville, was also known to be a member of a gang.

The trial court redacted the portions of the video recording which mentioned the defendant's unrelated arrest for theft. The trial court also redacted portions of the video recording in which the defendant mentioned his previous drug use with Mr. Tidwell and the defendant's previous time served in jail.

The trial court found, by clear and convincing evidence, that Rule 404(b) was not offended by the introduction of the defendant's admissions of his gang affiliation. The trial court concluded that the defendant's statements had been made in an attempt to conceal his involvement in the April 12, 2016 shooting and held that "evidence of efforts to conceal the crime are highly probative to establish the intent of the perpetrator." In its ruling, the trial court stated

> [T]he admission by the defendant that he was at a gang meeting goes to motive to assist him and his codefendants in covering up the crime and conceal that and avoid apprehension. In addition, . . . it doesn't really corroborate the bigger version of events. But it does go to show that there's a difference there. But regardless, though, the defendant had a motive to assist himself and the [co]defendants of covering up the crime by saying he was at a gang meeting. Obviously, there's testimony

- 12 -

indicating that he wasn't. So, the [c]ourt finds there was a material issue there. . . [and t]he court finds the probative value does outweigh the prejudicial effect. So[,] the [c]ourt believes that his answers to where he was when the alleged crime happened are highly probative and need to come into the evidence and let the jury hear it.

In this appeal, the defendant asserts that the trial court erred by admitting evidence of his gang affiliation and activity. He argues that the evidence held no probative value at all and was unduly prejudicial to the jury. Further, the defendant contends that the evidence was not logically connected to the defendant's charged offenses and should have been excluded. Inasmuch as the State needed the evidence to impeach the defendant, the defendant argues that it could have done so without any mention of his gang affiliation. The State argues that the trial court did not err.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

This court has held that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)." *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 620612, at *3 (Tenn. Crim. App., Jackson, June 27, 2001). Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

When the trial court substantially complies with the requirements of Rule 404(b), we review that court's ruling for an abuse of discretion. *See Thacker*, 164 S.W.3d at 240. "[I]n view of the strict procedural requirements of Rule 404(b)," however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Here, the trial court complied with Rule 404(b)'s procedural requirements, so our review of its holding is limited to an abuse of discretion. In denying the defendant's Rule 404(b) motion, the trial court determined that the evidence of the defendant's gang affiliation was relevant to his motive to conceal his involvement in the April 12, 2016 shooting. The trial court noted that "the defendant had a motive to assist himself and the defendants of covering up the crime by saying he was at a gang meeting" and found "his answers to where he was when the alleged crime happened" to be "highly probative."

We disagree with the trial court's determination that the defendant's repeated references to his gang affiliation was "highly probative." As the defendant correctly points out in his brief, there "is no evidence whatsoever that the dispute between the victim and [Isiah] was gang related." Though the trial court correctly noted that evidence of a defendant's motive and intent to cover up his involvement in the crimes for which he is accused may, in certain cases, be highly probative, the defendant's attempts to cover up his involvement in the instant case could have been shown through less prejudicial methods. *See State v. Hector J. Jauregui*, No. E2006-00868-CCA-R3-CD, 2007 WL 2700057, at *11 (Tenn. Crim. App., Knoxville, Apr. 24, 2007) ("Evidence of efforts to conceal the crime or to flee a crime scene is highly probative to establish the intent of a perpetrator."). The trial court could have redacted the defendant's mentioning of his gang affiliation from the video recording to avoid the high risk of prejudicial effect upon the jury while preserving his mentioning that he was in Nashville to visit his mother, family, and the mother of his child, which the State could have then used to impeach the defendant's testimony to the contrary. Thus, the trial court abused its discretion in finding that the evidence of the defendant's admissions of his gang affiliation was "highly probative."

- 14 -

Regardless, we conclude that the trial court's error in the admission of this evidence was harmless. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see State v. Reynolds*, 635 S.W.3d 893, 928 (Tenn. 2021) (providing that when a trial court "admits evidence in violation of the Tennessee Rules of Evidence, we ordinarily address this non-constitutional error using the harmless error analysis of Rule 36(b)"). Here, the State did not emphasize the defendant's admissions of his gang affiliation in its proof, nor did it question the defendant on the topic during cross-examination. During the State's closing arguments, the State remarked:

> Let's also talk about how many opportunities Mr. Hughes has had to tell the truth about what happened . . . He was at work. He wasn't there, he wasn't even there, he was at work. He got off at 7:00 o'clock, hung out in the parking lot, then he went to Hickman. He was with his girl. He was – he was talking to his baby mama, he was talking to his girlfriend, he was at a gang meeting. That's a good one. Because you know what, the TBI agents aren't going to be able to check that excuse out. They're not going to be able to call up gang members and say, hey, was Mr. Hughes there having a gang meeting with y'all. He had three years and seven months to tell the truth, but he chose today. He wants you to check your common sense at the door. That's what he wants you to do.

The State mentioned the defendant's gang affiliation as part of a recitation of the defendant's varying accounts of what occurred and where he was on April 12, 2016. The State did not insinuate that the defendant was truly a member of a gang but instead pointed to the defendant's interview in attempt to impeach him. Further, the defendant testified that he intentionally misled Sergeant Atkins and Detective Bausell during his interview. The State's use of this evidence during closing arguments in a last-minute attempt to impeach the defendant's testimony likely diminished its prejudicial impact. Because we conclude below that the evidence was sufficient to convict the defendant, we find that the trial court's error in the admission of the defendant's mentioning of his gang affiliation was harmless.

Accordingly, we cannot say that the trial court committed reversible error in allowing evidence of the defendant's voluntary admissions of his gang affiliation to be presented to the jury.

*II. Jury Instruction*

- 15 -

The defendant also argues that the trial court erred in neglecting to instruct the jury on the need for corroborative evidence of an accomplice's testimony. This is the first time the defendant has raised this issue, and he concedes that normally, it would be waived. *See* Tenn. R. App. P. 3(e) ("No issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same as specifically stated in a motion for new trial; otherwise such issues will be treated as waived.") The defendant nevertheless contends that he is entitled to plain error relief on this issue.

This court may review certain issues not properly preserved for appeal when the issue affects the substantial rights of a party, but our review in such cases is limited to plain error review. *See* Tenn. R. App. P. 36(b). All five of the following factors must be met to grant relief under plain error review:

> (a) [T]he record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Relief under the *Adkisson* test is limited to those instances in which the plain error "more probably than not affected the verdict returned by the jury." *Adkisson*, 899 S.W.2d at 646 (footnotes omitted). Additionally, "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283.

In criminal cases, a defendant has the right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Thus, it follows that the trial court has a duty to give a complete charge of the law applicable to the facts of a case. *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The failure to do so deprives the defendant of the constitutional right to a jury trial. *Garrison*, 40 S.W.3d at 432. In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). Notably, when jury instructions fully and fairly state the applicable law, a trial court is not required to provide special instructions. *State v. Mann*, 959 S.W.2d 503, 521 (Tenn. 1997); *State v. Kelley*, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984).

As a preliminary matter, we acknowledge recent changes in the law as it applies to accomplice testimony. Our supreme court recently abrogated our former

common law accomplice-corroboration rule and, in doing so, abolished the need for corroborative testimony for accomplices. *State v. Tony Thomas and Laronda Turner*, ___ S.W.3d ___, No. W2019-01202-SC-R11-CD, 2024 WL 979852 (Tenn. 2024). However, because our supreme court held that this rule applies only to prospective cases, and because this appeal was already pending when that decision was announced, we will apply our former common law accomplice-corroboration rule to this case.

The accomplice-corroboration rule held "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001)); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964). Indeed, "[w]hen the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

The State concedes that as an unindicted co-conspirator who received immunity from prosecution in exchange for his testimony, Mr. Flanagan was an accomplice as a matter of law. *See State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995). Accordingly, the trial court erred by failing to declare Mr. Flanagan an accomplice and by failing to issue a jury instruction on the accomplice corroboration-rule. *See State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnotes omitted). However, this error was harmless. Though trial courts bear a responsibility to issue a correct and complete charge of the law to the jury, *Garrison*, 40 S.W.3d at 432, a trial court's failure to issue an accomplice-corroboration rule instruction is harmless error where there is

sufficient corroboration of the accomplice's testimony. *See State v. Ballinger*, 93 S.W.3d 881, 888 (Tenn. Crim. App. 2001).

Mr. Flanagan's testimony was corroborated by the testimonies of several witnesses at trial. Mr. Gilbert and Mr. Corlew corroborated Mr. Flanagan's testimony by placing Isiah and two other men at the picnic grounds. Mr. Gilbert also noted that he heard more than a dozen gunshots afterwards and testified that he saw the three men fleeing the picnic grounds shortly thereafter, with Isiah following some distance behind the other two. This evidence comports with Mr. Flanagan's testimony.

Mr. Wilson also corroborated Mr. Flanagan's testimony by testifying that the defendant, Kurtis, Isiah, and Mr. Flanagan were present at Kurtis' apartment on the morning of April 12, 2016. He also noted that the men were engaged in a conversation regarding Isiah's intention to fight Mr. Tidwell and that the defendant "didn't really say much at all." This evidence comports with Mr. Flanagan's testimony.

Agent Hodge testified that her examination of the evidence recovered from the picnic grounds indicated that three firearms were used in the April 12, 2016 shooting. Agent Atkins also testified that a Kel-Tec pistol was recovered from the picnic grounds, and Agent Hodge concluded that this Kel-Tec pistol was used to fire several of the bullets recovered from the picnic grounds. Agent Hodge testified that a Smith & Wesson firearm was used to fire several of the bullets recovered from the picnic grounds and that a third firearm was used which was not recovered. This evidence comports with Mr. Flanagan's testimony that Isiah, Kurtis, and the defendant were armed when they went to the picnic grounds.

The defendant also corroborated large portions of Mr. Flanagan's testimony. The defendant agreed with Mr. Flanagan's account of the conversation at Kurtis' apartment, noting that he was distant because the dispute "had nothing to do with me." He also noted that Isiah grew agitated during the discussion, that Isiah initially drove the men to the picnic grounds but that Mr. Flanagan took over after Kurtis wrecked his motorcycle and joined them in the vehicle. The defendant further agreed that Mr. Flanagan drove them from the picnic grounds to White Bluff, where they abandoned their vehicle and were driven to Nashville by Ms. Worley.

The defendant notes that the corroborating testimony is, at times, inconsistent, and we agree. However, it is not necessary that the corroborating evidence corroborate each part of the accomplice's testimony, only that the accomplice's testimony be *sufficiently* corroborated. *Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803). Accordingly, we conclude that Mr. Flanagan's testimony was sufficiently corroborated. As such, consideration of the trial court's error in failing to issue an accomplice-corroboration rule instruction is not necessary to do substantial justice, and the defendant is not entitled to plain error relief on this issue.

## III. Sufficiency

Finally, the defendant challenges the sufficiency of the convicting evidence as it relates to his convictions for the first degree murder of Mr. Bell and conspiracy to commit first degree murder. The State argues that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

### A. First Degree Murder

As relevant here, "First degree murder is . . . a premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Additionally, "[t]he identity of the perpetrator is an essential element of any crime." *State v. Rice*, 194 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361 app. at 388 (Tenn. 2005)); *accord State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim App. 1982) (citing *Stubbs v. State*, 393 S.W.2d 150, 153 (Tenn. 1965)).

As used in the statute,

"premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Here, the trial court provided an instruction to the jury on criminal responsibility. A person is criminally responsible for an offense committed by the conduct of another "if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-402(a). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386.

The defendant contends that the convicting evidence was insufficient partially because it was based upon Mr. Flanagan's uncorroborated testimony that he saw the defendant equipped with a firearm both when he arrived and when he left the picnic grounds. Because we have already concluded that Mr. Flanagan's testimony was sufficiently corroborated, this argument is without merit.

The defendant also points to Mr. Springer's testimony that though he saw the defendant at the picnic grounds, he neither saw the defendant armed nor saw him shoot any of the victims. The State argues that the evidence adduced at trial indicated that the defendant intentionally shot Mr. Bell because Mr. Bell was attempting to flee the picnic grounds after the gunfight began. The State further contends that the defendant's intent to kill Mr. Bell can be inferred from his leaving the picnic grounds still equipped with the murder weapon, his suggestions that he and the codefendants "trim the fat," and his dishonest statement to Detective Bausell and Agent Atkins that he was in Nashville when the shooting occurred.

Viewing the evidence in the light most favorable to the State, we cannot conclude that the evidence was insufficient to support the defendant's conviction for first

degree murder. Mr. Flanagan testified the defendant traveled to the picnic grounds equipped with a firearm, with knowledge of Isiah's intent to fight Mr. Tidwell. Mr. Flanagan also testified that he heard "15 or 20 or more" gunshots while he waited in the vehicle near the picnic grounds, evidence which was corroborated by Mr. Gilbert, Mr. Corlew, Mr. Springer, and Agent Hodge's testimony regarding the evidence collected from the picnic grounds. The proof established that after the shooting, the defendant left the picnic grounds, still armed, with Kurtis and Isiah. Afterwards, the defendant remarked on the need to "trim the fat," which a rational jury could have identified as a threat to eliminate Mr. Flanagan as a witness. The men then abandoned their vehicle in White Bluff and fled to Nashville with Ms. Worley. Mr. Springer also placed the defendant near Mr. Bell's vehicle, to which Mr. Bell fled during the shooting, and detailed Isiah and Kurtis' assaults of himself and the other victims. Agent Hodge further concluded that three firearms had been used during the shooting. Mr. Flanagan testified that Isiah returned to the vehicle unarmed, and a single Kel-Tec pistol was recovered from the picnic grounds, which Agent Hodge testified had been used to fire several of the bullets during the shooting. Additionally, she concluded that a Smith & Wesson firearm had been used to fire several of the bullets recovered from the picnic grounds, and, similarly, that an SCCY firearm had been used to shoot and kill Mr. Bell.

Drawing all inferences in the State's favor, the evidence was sufficient to support the defendant's conviction for first degree murder.

### B. Conspiracy to Commit First Degree Murder

The defendant also argues that the evidence was insufficient to support his convictions for conspiracy to commit first degree murder. As relevant here, conviction for conspiracy requires proof that "two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." T.C.A § 39-12-103(a). "No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." *Id*. § 39-12-103(d).

No formal agreement is necessary to establish the existence of a conspiratorial relationship. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). The conspiracy may be demonstrated by circumstantial evidence and the conduct of the parties while undertaking the illegal activity. *Id*.

Viewing the evidence in the light most favorable to the State, we conclude that the proof demonstrated that the defendant was aware of Isiah's conflict with Mr. Tidwell and his intentions to fight him at the picnic grounds. The defendant, while armed, chose to accompany Kurtis and Isiah, who were also armed, to the picnic grounds to settle

Isiah's dispute with Mr. Tidwell. As noted above, the evidence also supported the jury's conclusion that the defendant killed Mr. Bell and that he left the picnic grounds still equipped with his firearm. We conclude that this evidence is sufficient for a rational jury to conclude that the defendant was engaged in a criminal conspiracy with Isiah and Kurtis to commit murder. Accordingly, the evidence was sufficient to support the defendant's conviction for conspiracy to commit first degree murder.

### IV. Judgment Forms

Finally, we note that the defendant's judgment forms list his convictions for conspiracy to commit first degree murder as being pursuant to Code section 39-1-604. This statute was repealed in 1989, *see generally* Act of June 12, 1989 § 1, and criminal conspiracy is currently codified at Code section 39-12-103. This court "may at any time correct clerical mistakes in judgments . . . arising from oversight or omission." Tenn. R. App. P. 36. Because our review of the record reflects that the defendant was charged and convicted of three counts of conspiracy to commit murder pursuant to Code section 39-12-103, we remand this cause for correction of the defendant's judgments of conviction to reflect the defendant's convictions under the proper statute.

Accordingly, the judgments of the trial court are affirmed, and the case is remanded to the trial court for entry of corrected judgments to reflect the defendant's convictions under the proper conspiracy statute.

 

 

 

_____
JAMES CURWOOD WITT, JR., JUDGE

- 22 -